UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ELMER GRIFFITH,

      Plaintiff,

vs.                                                                    Case No.  3:07-cv-247-J-MCR

MICHAEL J. ASTRUE, Commissioner of the
Social Security Administration,

         Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of a final administrative

decision denying his application for Social Security benefits.  The Court has reviewed

the record, the briefs, and the applicable law.  For the reasons set forth herein, it is

recommended the Commissioner's decision be **REVERSED** and **REMANDED** for

proceedings not inconsistent with this opinion.

## I.      PROCEDURAL HISTORY

Plaintiff protectively filed an application for a period of disability and Disability

Insurance Benefits ("DIB") on March 17, 2004, alleging an inability to work since April 6,

2003.  (Tr. 46-48).  The Social Security Administration ("SSA") denied this application

initially and on reconsideration.  (Tr. 21-27).  Plaintiff then requested (Tr. 31) and

received a hearing before an Administrative Law Judge (the "ALJ") on February 9, 2006.

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate
Judge.  (Docs. 8 & 9).

(Tr. 34-68).  On October 24, 2006, the ALJ issued a decision finding Plaintiff not

disabled.  (Tr. 11-20).  Plaintiff then filed a Request for Review by the Appeals Council,

but the Appeals Council denied Plaintiff's Request for Review (Tr. 5-7), thus making the

ALJ's October 24, 2006 decision the final decision of the Commissioner.  Plaintiff timely

filed his Complaint in the U.S. District Court on March 28, 2007.  (Doc. 1).

## II.    NATURE OF DISABILITY CLAIM

### A.    <u>Basis of Claimed Disability</u>

Plaintiff claims to be disabled since April 6, 2003, due to loss of usage in his left

arm, hypertension, degenerative disc disease in his back and neck, gout, permanent

nerve damage, sleep apnea, anxiety, depression, and pain.  (Tr. 56, 63, 67).

### B.    <u>Summary of Medical Evidence Before the ALJ</u>

Plaintiff was 44 years of age on the date of the hearing.  (Tr.  19).  He has a high

school education with work experience as a material handler and as a production

controller for the U.S. Navy.  (Tr. 68, 73).   The record indicates Plaintiff was involved in

a vehicular accident on April 6, 2003.  (Tr. 103).  He fractured his ribs on the left side of

his body and lost use of his left arm as a result of this accident.  <u>Id.</u>  The following is a

summary of Plaintiff's medical history, limited to the issues Plaintiff raises in this appeal.

Plaintiff was seen at St. Vincent's Medical Center ("St. Vincent's") on April 11

2003, because he was experiencing pain in his spine.  (Tr. 149-166).  He underwent an

x-ray of the cervical spine which showed hypertrophic degenerative change of the

cervical spine.  (Tr. 166).   On May 19, 2003, Plaintiff underwent an MRI of his cervical

spine, which showed "mild degenerative changes of the cervical spine . . . with broad-

based posterior disc protrusions at the C 4-5 and C6-7 levels with compromise of the

neuroforamina bilaterally at the C4-5 level[,] more so on the left than the right side. There is some mild encroachment upon the neuroforamina bilaterally at the C6-7 level." (Tr. 107).

Plaintiff also experienced neck and arm pain and thus, he returned to St. Vincent's Medical Center on October 28, 2003 and underwent a series of tests. A CT of Plaintiff's cervical spine with contrast demonstrated multilevel degenerative disc disease with neural foraminal narrowing at several levels, particularly on the right at C3-4. (Tr. 162, 164). It further showed right apical pleural parenchymal scarring and bullous changes. Id. A myelogram of Plaintiff's cervix showed mild degenerative disc disease. (Tr 163). A second CT of Plaintiff's cervical spine demonstrated minimal disc space narrowing at C6-7 and moderate to severe foramina narrowing bilaterally at C3-4 and on the left at C4-5, as well as moderate neural foraminal narrowing on the left at C5-6. (Tr. 160).

Plaintiff was evaluated by Bruce Steinberg, M.D., at the Jacksonville Orthopaedic Institute on June 18, 2003. (Tr. 211). Dr. Steinberg noted Plaintiff complained of persistent pain and weakness in his left shoulder since his car accident. Id. On evaluation, Dr. Steinberg noted Plaintiff's inability to abduct his left arm past 45 degrees and a positive supraspinatus test with pain. Id. An x-ray showed AC joint arthritis and early arthritic changes of the glenohumeral joint area. Id. Dr. Steinberg diagnosed Plaintiff with possible left shoulder rotator cuff tear and AC joint arthritis. Id. He ordered an MRI to evaluate Plaintiff's left shoulder. Id.

Plaintiff returned to see Dr. Steinberg on June 30, 2003, after an MRI was taken of Plaintiff's shoulder. (Tr. 210). Dr. Steinberg noted the MRI was negative for

3

abnormality, but that Plaintiff continued to have a lot of pain in the left shoulder and the inability to flex or abduct.  Id.  Dr. Steinberg gave Plaintiff a steroid injection in an attempt to reduce his pain; however, even after the injection Plaintiff was still unable to forward flex or abduct and he had "exquisite weakness."  Id.  Dr. Steinberg was concerned that there was a missed rotator cuff tear which did not appear on the MRI and/or that Plaintiff had suffered a traction injury from the accident and had a suprascapular nerve lesion.  Id.

On August 1, 2003, Dr. Steinberg noted Plaintiff was significant for the possibility of brachial plexopathy, as well as C5 radiculopathy.  (Tr. 209).  He also noted Plaintiff had carpal tunnel syndrom and cubital tunnel syndrome.  Id.  Plaintiff's strength in his shoulder was improving, as was his ability to abduct and flex his shoulder, but he was still experiencing pain in the posterior aspect of his shoulder and neck.  Id.  According to Dr. Steinberg, as of August 22, 2003, Plaintiff was making slow but steady progress. (Tr. 208).  An arthrogram of his left shoulder taken August 4, 2003, was negative for rotator cuff pathology.  Id; (Tr. 291).  Dr. Steinberg opined that his findings from Plaintiff's examination were consistent with brachial plexopathy.  Id.  He recommended observation and therapy.

Dr. Steinberg continued evaluating Plaintiff on a regular basis from August 2003 through November  2003 and his reports demonstrate that Plaintiff's pain and strength fluctuated.  (Tr. 206-208).  Dr. Steinberg recommended Plaintiff consult with a neurosurgeon.  (Tr. 206).  Dr. Steinberg noted that the MRI of Plaintiff's spine, taken at St. Vincent's, showed broad-based disc protrusions and neuroforaminal narrowing of the 4-5 level, more so on the left as compared to the right.  Id.  Dr. Steinberg opined that

4

this exam, combined with an EMG test which showed plexopathy, suggested Plaintiff should consult a neurosurgeon. Id.

Plaintiff reported back to Dr. Steinberg on November 19, 2003 after a consultation with a neurosurgeon who advised Plaintiff that surgery was not an option. (Tr. 205). Dr. Steinberg noted that Plaintiff was able to produce paresthesias and pain in his neck, shoulder, and left arm when he turned his head to the left side. Id. Additionally, Plaintiff was still very weak in the left arm and had trouble abducting. Id. Dr. Steinberg recommended a second opinion of the cervical spine. Id.

Dr. Scharf began evaluating Plaintiff on December 17, 2003. (Tr. 204-5). On evaluation, Dr. Scharf noted Plaintiff's range of motion in his cervical spine was limited to 30 percent, but there was no muscle spasm. (Tr. 204). He opined most of Plaintiff's pain was due to hypertension. Id. He also noted weakness in Plaintiff's left shoulder abduction. Id. Dr. Scharf diagnosed Plaintiff with cervical spondylosis with radiculopathy. Id. Specifically, he noted that Plaintiff has two problems, "he has an intrinsic problem in his shoulder causing his weakness and limited motion. He has neck pain with a radicular component." (Tr. 203). However, Dr. Scharf also noted that Plaintiff does not have anything specific on which to operate. He recommended physical therapy three times per week. Id.

Plaintiff continued to have pain and weakness in his neck and shoulder, however, it seemed to be slowly improving. Id. Dr. Scharf noted on March 3, March 10, and March 16, 2004 that Plaintiff was unable to work. (Tr. 201-202). He qualified this statement by noting that Plaintiff' job entails repairing aircrafts and he has a lot of overhead lifting. Id. On March 24, 2004, Dr. Scharf completed a questionnaire sent by

the SSA's Disability Office.  He opined Plaintiff's functional impact of his loss of motion was slight and that Plaintiff had no muscle spasm but he did have weak shoulders.  (Tr. 200).  He also noted Plaintiff was able to squat and walk on his toes and heels.  Id.

Plaintiff returned to see Dr. Scharf on June 2, 2004, at which time Dr. Scarf opined Plaintiff had symptomatic spondylolisthesis with degenerative disc disease.  (Tr. 199).  Dr. Scharf again opined Plaintiff was not a candidate for surgery; rather, he recommended physical therapy three times a week for four weeks and also recommended Plaintiff see a pain management specialist.  Id.

On April 19, 2004, an MRI taken of Plaintiff's lumbar spine at St. Vincent's suggested spondylolysis with secondary spondylolisthesis and mild acquired spinal stenosis at the L5-S1 level.  (Tr. 153).  Another MRI taken on April 19, 2004  of Plaintiff's lumbar and lateral spine showed L5-S1 degenerative disc disease, spondylolisthesis, and possible spondylolysis.  (Tr. 152).

On May 5, 2004, Plaintiff was examined by Hung V. Tran, M.D. pursuant to a request by the SSA's Disability Office.  Dr. Tran noted Plaintiff complained of pain in his neck, back, head, shoulders and knees.  (Tr. 168).  Dr. Tran also noted Plaintiff had high blood pressure.  Id.  After performing a physical evaluation on Plaintiff, Dr. Tran noted Plaintiff was cooperative and friendly and wanted to help in the diagnostic process.  (Tr. 169).  He documented that Plaintiff did not experience pain during a range of motion exam of his lumbar, thoracic, and cervical spine while Plaintiff was in a sitting or supine position; however, Plaintiff did have pain and loss of motion in his lumbar spine.  (Tr. 170).  Moreover, Dr. Tran noted pain and loss of motion on Plaintiff's left shoulder, but no numbness or impairment of gross or fine movements.  Id.  Dr. Tran

6

also noted Plaintiff had pain and loss of motion in his knees and his gait was normal even without a cane.  Id.  Dr. Tran diagnosed Plaintiff as having pain in his neck, back and extremities, headache, and high blood pressure.  (Tr. 171).

On May 27, 2004, a state agency consultant completed a physical functional capacity assessment on Plaintiff.  (Tr. 190-197).  The state agency consultant diagnosed Plaintiff with degenerative disc disease, hypertension, and pain in his shoulders and knees.  (Tr. 190).  She opined Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour day, sit about 6 hours in an 8-hour day, and was limited in pushing and/or pulling with his upper extremities.  (Tr. 191).  She determined Plaintiff should avoid ladders/ropes/scaffolds at all times and can only occasionally climb, balance, kneel, crouch, and crawl.  (Tr. 192). The consultant found Plaintiff limited in his capacity to reach overhead (Tr. 193) and further found that he should avoid concentrated exposure to vibrations and hazards (Tr. 194).  Finally, the consultant opined Plaintiff's symptoms are attributable to a medically determinable impairment, but are disproportionate to the expected severity or expected duration of such medically determinable impairment.  (Tr. 195).

On August 6, 2004, another state agency consultant completed a second residual functional capacity assessment of Plaintiff.  (Tr. 226-233).  In this assessment, the consultant diagnosed Plaintiff with back pain and right shoulder pain.  He opined Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour day, sit about 6 hours in an 8-hour day, and was limited in pushing or pulling with his upper extremities.  (Tr. 227).  Moreover, the consultant determined Plaintiff had occasional limitations in climbing, kneeling, crouching, and

7

crawling and was frequently limited in balancing and stooping.  (Tr. 228).  He also determined Plaintiff could not reach overhead with his right shoulder (Tr. 229) and he should avoid working around hazards (Tr. 230).

Plaintiff saw Willie A. Pennick, M.D., a family practitioner, beginning in August 1999 through October 2004, for multiple complaints including pain in his hip, knees, shoulder, lower back, and chest.  (Tr. 235-277).  Plaintiff also complained of hypertension, anxiety, and depression to Dr. Pennick.  (Tr. 235-277).  Dr. Pennick referred Plaintiff to specialists, including Dr. Scharf.  (Tr. 241-42).

Plaintiff was seen at the Pain Center by Andrea M. Trescot, M.D., from July through October 2004.  At his initial visit on July 26, 2004, Plaintiff complained of bilateral neck pain, bilateral arm pain, and bilateral low back pain, stating his pain began in April 2003.  (Tr. 287).  Dr. Trescot noted tenderness and spasm of the bilateral SCM muscles, bilateral trapezius muscles, and bilateral levator scapulae muscles, as well as tenderness of the left deltoid, biceps tendon, bilateral sacrotuberous ligaments, left suprascapular nerve, and tenderness and spasm of piriformis.   (Tr. 288).  Dr. Trescot diagnosed Plaintiff with Deltoid tendinitis, limb pain, and questionable radiculopathy.  Id. She performed tendon sheath injections which eliminated some of Plaintiff's pain.  Id. On August 4 and 5, 2004, Plaintiff underwent a series of tests, including sensory nerve testing and an EMG.  (Tr. 311).  The sensory nerve test results were normal with no evidence of cervical radiculopathy, id; however, the EMG results were consistent with left upper brachial plexusopathy.  (Tr. 309).

Plaintiff returned to see Dr. Trescot on August 12, August 27, and September 9, 2004, each time complaining of pain in his neck, shoulder and/or back.  (Tr. 283-86).

8

Dr. Trescot administered injections, but they only provided Plaintiff temporary pain relief. Id.

On October 19, 2004, Plaintiff was referred by Dr. Trescot to Sylvie Martin, an occupational therapist, who worked at Brooks Health Systems.  (Tr. 278).  Ms. Martin completed a Functional Capacity Evaluation on Plaintiff, opining Plaintiff demonstrated no ability to perform work activities such as "bending, squatting, twisting, climbing stairs, reaching secondary to decreased range of motion, weakness and safety."  Id.  She also found Plaintiff only demonstrated an occasional ability to sit and had no ability to stand or walk, secondary to maintaining neutral trunk alignment.  Id.  Ms. Martin reported Plaintiff had a high level of pain, weakness, and decreased balance and was unable to perform dynamic lifting or pushing/pulling at any level secondary to decreased balance, safety, decreased trunk and extremities range of motion.  Id.  Although Ms. Martin noted Plaintiff demonstrated signs of good efforts such as increased hydrosis and tremors, she explicitly stated that the reliability of Plaintiff's efforts were not evaluated as part of the test.  Id.

Plaintiff returned to see Dr. Trescot on February 17, 2005, still complaining of low back pain radiating into his hips and tailbone and bilateral neck and shoulder pain.  (Tr. 308).  Plaintiff received bilateral sacral nerve blocks to ease his pain.  Id.  Plaintiff returned to see Dr. Trescot approximately once each month through December 2005, complaining of significant pain each time and receiving injections for such pain.  (Tr. 292-307).

Plaintiff was also evaluated by R. David Heekin, M.D., an orthopedic surgeon, from October 2003 through April 2005.  (Tr. 315-336).  Initially, on October 15, 2003,

9

Plaintiff reported he was unable to use his left arm and that he had pain and weakness in it.  (Tr. 332).   Dr. Heekin noted that x-rays of Plaintiff's left shoulder demonstrated acromioclavicular degenerative changes.  (Tr. 323).  He diagnosed Plaintiff with left shoulder pain, left brachial plexopathy, and cervical spondylosis.  (Tr. 330).  Dr. Heekin opined that the acromioclavicular degenerative changes could be addressed with arthroscopy; however, the major problem is the brachial plexopathy, which should be addressed by a neurologist and neurosurgeon.  Id.  Plaintiff returned to Dr. Heekin's office on November 4, 2003, after undergoing a myelogram which showed mild degenerative disc disease at the C3-4 level with mild anterior osteophyte spurring.  (Tr. 320).  Dr. Heekin diagnosed Plaintiff with left shoulder AC joint DJD with impingement and left cervical plexopathy.  Id.

On February 1, 2005, Plaintiff returned to Dr. Heekin's office, still complaining of bilateral shoulder pain.  (Tr. 319).  X-rays of Plaintiffs shoulder showed changes consistent with calcific tendinitis and AC joint degenerative changes.  Id.  Radiographs of the left shoulder showed AC joint degenerative changes.  Id.  Dr. Heekin diagnosed Plaintiff with right shoulder calcific tendinitis and left shoulder rotator cuff tendinitis.  Id.  Dr. Heekin suggested conservative treatment with physical therapy and cortisone injections.  Id.  He stated "the physical therapy is medically necessary in order for the patient to perform activities of daily living independently."  Id.   A discharge summary from Dr. Heekin's office, dated April 5, 2005, noted Plaintiff could not return for further prescriptions due to co-payment difficulties.  (Tr. 315).

Subsequent to Plaintiff's hearing, Plaintiff obtained a physical RFC form from Dr. Pennick which was dated February 6, 2006.  (Tr. 339).  Dr. Pennick opined Plaintiff can

occasionally lift up to 10 pounds, but never more than 11 pounds.  Id.  He further opined

Plaintiff can only sit, stand, and walk continuously without interruption for one hour and

can sit, stand, and walk for a total of two hours each in an 8-hour work day.  Id.  Dr.

Pennick determined Plaintiff can never pull/push or use fine manipulation in his right

hand, and he can only occasionally perform simple grasping with his right hand.  Id.

Similarly, he determined Plaintiff can only occasionally perform simple grasping,

pulling/pushing, and fine manipulation with his left hand.  Id.  Importantly, Dr. Pennick

noted Plaintiff exhibited no evidence of malingering.  Id.  Finally, Dr. Pennick opined that

Plaintiff's attendance at work over the course of a 5-day week would be expected to be

inconsistent and sporadic due to reasonably expected exacerbation of conditions.  Id.

On February 23, 2006, Dr. Trescot reported that she agreed with the opinions of

Dr. Pennick, as expressed in his physical RFC assessment dated February 6, 2006.

(Tr. 340).  Dr. Trescot opined that Plaintiff's lumbar pain, shoulder pain, limb pain, sacral

neuralgia, degenerative disc disease, and rib fractures could reasonably be expected to

produce the type and degree of symptoms and limitations expressed by Plaintiff.  Id.

Finally, Dr. Trescot opined the above limitations existed since at least April 30, 2004, as

evidenced by an MRI of his lumbar spine.  Id.

In a medical report dated November 20, 2006, Dr. Trescot noted that recent

imaging of the cervical spine revealed decreased signal intensity of the disc spaces at

all levels. (Tr. 345).   She diagnosed Plaintiff with suspected multilevel mild

degenerative disc disease, small disc herniations and/or possible osteophytes at C2-C3,

and neural foramen encroachment worse at C3-C4, C4-C4, C5-C6 level (bilateral).  Id.

C.    **Plaintiff's Testimony at the Hearing**

At the hearing, Plaintiff testified that he feels pain everyday.  (Tr. 375-77).  He

takes medications for pain, muscle spasms, depression, anxiety, and gout.  (Tr. 377).

Plaintiff stated his worst pain is in his back, hips, and thighs, and he experiences pain all

day long.  (Tr. 377-78).  On a scale of one to 25, Plaintiff rated his pain in his lower back

as a 15.  (Tr. 378). Plaintiff stated his next worst pain is in his shoulders and he rated

this pain at about an 18.  (Tr. 378-79).  He testified that his neck also hurts every day,

but that sometimes he can work the pain out.  (Tr. 379).  He ranked his neck pain at an

18 or 19 on a bad day, but a 14 on a good day.  Id.  Plaintiff stated he can sit for about

30 minutes and stand approximately five minutes before having to sit down.  (Tr. 380).

He testified that he could only walk about 150 to 200 yards before he feels burning in

his back and hips, and he represented he could lift approximately five pounds in his left

hand and maybe ten pounds in his right hand.  Id.  Finally, Plaintiff testified that he gets

drowsy from taking his medications.  Id.

D.    **Summary of the ALJ's Decision**

A plaintiff is entitled to disability benefits when he is unable to engage in

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to either result in death or last for a continuous

period of not less than 12 months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. §

404.1505.  The ALJ must follow five steps in evaluating a claim of disability.  See 20

C.F.R. §§ 404.1520.  First, if a claimant is working at a substantial gainful activity, he is

not disabled.  29 C.F.R. § 404.1520(b).  Second, if a claimant does not have any

impairment or combination of impairments which significantly limit his physical or mental

ability to do basic work activities, then he does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.  20 C.F.R. § 404.1520(f).  Plaintiff bears the burden of persuasion through step four, while at step five, the burden shifts to the Commissioner.  Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287 n.5 (1987).

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 13).  At step two, the ALJ found Plaintiff's mild spinal stenosis at L5-S1, lumbar spondylosis with degenerative disc disease of the cervical spine, cervical spondylosis with radiculopathy, history of left shoulder brachial plexopathy, left mild carpal tunnel syndrome, obstructive sleep apnea, chronic obstructive pulmonary disease are severe impairments.  Id.   At step three, the ALJ determined Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 CRF Part 404, Subpart P, Appendix 1 (20 C.F.R. § § 404.1520(d), 404.1525 and 404.1526.  Id.  Next, the ALJ determined Plaintiff had the residual functional capacity ("RFC") to "perform work at the light exertional level that does not require more than occasional climb, balance, stoop, kneel, crouch, crawl; no continuous exposure to heights, hazards or vibration; frequent gross and fine manipulation of both hands; no overhead reach; and needs the ability to

13

sit/stand at will."  (Tr. 15).  At the time the ALJ determined Plaintiff's RFC, the ALJ also opined Plaintiff's reports of pain were not credible and that most of his limitations were self imposed.  (Tr. 17).

At step four, the ALJ utilized a Vocational Expert ("VE") who determined Plaintiff's past work was heavy, skilled, and was performed at the medium exertion level.  (Tr. 18).   The VE opined and the ALJ found that Plaintiff could not perform his past relevant work.  Id.  At step five, the ALJ posed four hypothetical questions to the VE and after relying on the VE's testimony, the ALJ found Plaintiff capable of performing the jobs of routing clerk and delivery marker.  Id.  Accordingly, the ALJ determined Plaintiff is not disabled within the meaning of the Social Security Act.  Id.

## III.   ANALYSIS

### A.   The Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the

14

district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

### B.    Issues on Appeal

Plaintiff argues four issues on appeal.  First, Plaintiff contends the ALJ erred by failing to provide good cause for rejecting the opinions of Drs. Pennick and Trescot – Plaintiff's treating physicians.  (Doc. 14, p. 1).  Second, Plaintiff argues the ALJ erred when he found Plaintiff can perform the exertional demands of light work, given the fact that Plaintiff relies on a cane for ambulating.  Id.  Third, Plaintiff argues the ALJ's credibility finding is not based on substantial evidence.  Id.  Finally, Plaintiff contends the ALJ failed to satisfy his burden of establishing that Plaintiff can perform work which exists in the national economy.  Id.  Because this Court finds the Commissioner's decision is due to be remanded based on the ALJ's failure to properly analyze Plaintiff's pain testimony, the Court will begin with this issue.

### 1.    Whether the ALJ Erred When Discrediting Plaintiff's Pain Testimony

Plaintiff argues the ALJ erred in discrediting his pain testimony.  (Doc. 14, pp. 21-23).  The ALJ must consider all of a claimant's statements about his symptoms,

including pain, and determine the extent to which the symptoms can reasonably be

accepted as consistent with the objective medical evidence.  20 C.F.R. § § 404.1528,

416.929.  In determining whether the medical signs and laboratory findings show

medical impairments which reasonably could be expected to produce the pain alleged,

the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying
> medical condition and either (2) objective medical evidence
> that confirms the severity of the alleged pain arising from that
> condition or (3) that the objectively determined medical
> condition is of such a severity that it can be reasonably
> expected to give rise to the alleged pain.

Foote, 67 F.3d at 1560 (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).

Here, the ALJ properly applied the Foote pain standard, as he found Plaintiff had

underlying medical impairments which "could reasonably be expected to produce the

alleged symptoms . . . ." (Tr. 16).  However, the ALJ further noted the [Plaintiff's]

statements concerning the intensity, persistence and limiting effects of these symptoms

are not credible."  Id.  When the ALJ makes the decision to discredit Plaintiff's testimony

because it is not substantiated by the medical evidence, the ALJ is required to provide

"explicit and adequate reasons" justifying his decision.  Cannon v. Bowen, 858 F. 2ed

1541, 1545 (11th Cir. 1988) (internal citations omitted).

In the instant case, the ALJ was required to justify his conclusion to discredit

Plaintiff's testimony regarding his pain by setting forth substantial evidence to support

such decision.  Plaintiff argues the ALJ erred because he selectively cited from the

record to support his conclusion and because his conclusions are not supported by the

record.   (Doc. 14, 21-23).  Specifically, Plaintiff submits that the ALJ only mentioned the

medical evidence which supports his conclusion and which does not show the full picture of Plaintiff's impairments.  Id. at 22.  The Court agrees.

Notably, in his credibility analysis, the ALJ only mentioned findings of mild stenosis and mild degenerative disc disease, as well as the lack of findings from various tests, but he failed to weigh these findings against the more severe findings documented in the record.  For instance, other than finding them severe, the ALJ failed to analyze the medical findings and effects of Plaintiff's broad-based disc protrusions and neuroforaminal narrowing of the 4-5 level, the L5-S1 degenerative disc disease, spondylolisthesis, possible spondylolysis, right shoulder calcific tendinitis, and left shoulder rotator cuff tendinitis.  Moreover, he failed to mention the many instances in the record documenting Plaintiff's pain by Dr. Steinberg, Dr. Scharf, Dr. Heekin, Dr. Pennick, and Dr. Trescott.  In fact, the ALJ completely ignored Dr. Heekin's statement that "physical therapy is medically necessary in order for the patient to perform activities of daily living independently."  The ALJ had a duty to evaluate all of the evidence and in this case, he erred by focusing only on the evidence that supported his conclusion.

The record is replete with documentation of Plaintiff's pain and notes by physicians documenting such pain.  Two of Plaintiff's treating physician's (Drs. Pennick and Trescot) specifically opined Plaintiff's pain is severe enough to prevent him from working[2], and three others (Dr. Steinberg, Dr. Scharf, and Dr. Heekin) documented

---

[2] While the ALJ mentioned Dr. Trescot's assessment of Plaintiff's pain, he notes that, inter alia, she failed to specify how Plaintiff's conditions affect his ability to function.  (Tr. 18).  To the contrary, it should be noted that Dr. Trescott specifically agreed with Dr. Pennick's RFC assessment finding Plaintiff incapable of working a full 8-hour day.   The remainder of the ALJ's reasoning for not affording Dr. Trescot's opinion controlling weight will be addressed in the following section.

Plaintiff's pain on multiple occasions.  Moreover, Dr. Heekin suggested Plaintiff's pain was severe enough to impede his daily activities and Dr. Scharf noted Plaintiff's pain prevented him from working at his most recent job.

Plaintiff also points out that the ALJ cited a statement from Plaintiff that his medications reduced and helped his pain level, but that the ALJ again failed to mention that Plaintiff stated the medications do not help the pain from returning.  (Doc. 14, p. 22). Plaintiff's argument is well taken.  The ALJ only painted half the picture.  In addition to failing to mention Plaintiff's statement that the medications do not prevent the pain from returning or that Plaintiff gets drowsy from the medications, the ALJ failed to question Plaintiff regarding the effect of the medications on his pain.  Rather, the ALJ relied on a portion of a written explanation about the effect of Plaintiff's medications which Plaintiff filled out early in the application process.

Plaintiff next argues the ALJ erred when he stated that the record indicates Plaintiff's shoulder pain had improved significantly.  (Doc. 14, p. 22).  In finding Plaintiff's shoulder pain had improved, it is clear the ALJ focused on specific instances in the record which showed Plaintiff's pain was improving at a specific point in time, but that he failed to take into account the substantial evidence demonstrating that Plaintiff complained of pain from 2003 through the date of the hearing and beyond, that he regularly sought treatment and physician's opinions for such pain, and that he continued to experience pain despite such treatments and therapy.

Plaintiff also argues that the ALJ erred by relying on the fact that Plaintiff can walk without a cane and continued to smoke cigarettes as justification for discrediting Plaintiff's testimony.  (Doc. 14, pp. 22-23).  The ALJ opined that Plaintiff had been non-

18

compliant with treatment because he had failed to quit smoking.  (Tr. 17).  Moreover, the

ALJ opined that most of Plaintiff's limitations have been self imposed.  <u>Id.</u>  While it is true

that Plaintiff had not quit smoking by the date of the ALJ's decision, this is no basis to

discredit Plaintiff's testimony of his pain.  <u>See</u> <u>Seals v. Barnhart</u>, 308 F. Supp. 2d 1241,

1251-52 (N.D. Ala. 2004) ("mere failure to stop smoking, . . . , does not constitute a

refusal to undertake a prescribed course of treatment" and the ALJ must make a finding

that failing to smoke would restore the claimant's ability to work).  To the contrary, the

medical evidence shows that Plaintiff's limitations and pain are a result of his objective

medical impairments, not his own behaviors.

In sum, the ALJ failed to base his decision to discredit Plaintiff's testimony on

substantial evidence.  "Subjective pain testimony that is supported by objective medical

evidence of a condition that can reasonably be expected to produce the symptoms of

which the claimant complains is <u>itself</u> sufficient to sustain a finding of disability.  <u>Hale v.

Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).  Here, the ALJ readily admitted that the

objective evidence demonstrates that Plaintiff had several determinable back, shoulder,

and neck impairments that could have caused Plaintiff's pain.  He, however, failed to

offer significant reasons why Plaintiff's testimony should be discredited.  Therefore, on

remand, the ALJ should consider the record as a whole, making sure to address the

relevant evidence and whether it supports or contradicts Plaintiff's testimony, and to

explicitly and adequately justify his conclusions.

### 2.    Whether the ALJ Erred by Failing to Give Plaintiff's Treating Physicians' Opinions Substantial Weight

Plaintiff argues the ALJ erred when he failed to accord substantial weight to

Plaintiff's treating physicians – Drs. Pennick and Trescott.  (Doc. 14, pp. 12-19).   The

opinion of a treating physician, such as Drs. Pennick and Trescott, "'must be given

substantial or considerable weight unless 'good cause' is shown to the contrary.'"

Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) (citing, Lewis v. Callahan, 125

F.3d 1436, 1440 (11th Cir. 1997)).  The Eleventh Circuit has determined "good cause"

exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2)

evidence supported a contrary finding; or (3) treating physician's opinion was conclusory

or inconsistent with the doctor's own medical records."  Phillips, 357 F.3d at 1241.

If the ALJ determines a treating physician's opinion does not warrant controlling

weight, the ALJ must weigh the medical opinion based on the following six factors: the

length of the treatment relationship and the frequency of the examinations; the nature

and extent of the treatment relationship; the medical evidence supporting the opinion;

consistency with the record as a whole; specialization in the medical issues at issue; and

any other factors which tend to support or contradict the opinion.  Hurley v. Barnhart, 385

F. Supp. 2d 1245, 1255 (M.D. Fla. 2005) (citing 20 C.F.R. § 404.1527(d)).  In any event,

whenever an ALJ decides to disregard the opinion of a treating physician, he/she must

clearly articulate the reasons for so doing.  Phillips, 357 F.3d at 1241.

Here, after the ALJ set forth the relevant medical evidence, including Dr.

Pennick's assessment of Plaintiff's limitations and Dr. Trescot's assessment of Plaintiff's

pain and limitations, the ALJ discredited these opinions by calling Dr. Pennick's opinion

conclusory and stating that Dr. Trescot's opinion is at odds with Dr. Scharf and Dr.

Heekin's treatment of Plaintiff.[3]  (Tr. 18).  While the ALJ was free to reject both Dr.

Pennick's and Dr. Trescott's opinions, his explanation -- which is void of any examples

explaining how the record fails to support such opinion -- is insufficient.  Although Dr.

Pennick's RFC assessment may have been conclusory, the record contained notes by

Dr. Pennick which documented Plaintiff's complaints of pain and his limitations.  The ALJ

failed to clearly articulate his reasoning as to why Dr. Pennick's own records did not

support his assessment of Plaintiff or how the remaining medical records failed to bolster

his opinion.

Moreover, although the ALJ opines Dr. Trescot's opinion is at odds with Dr.

Scharf's and Dr. Heekin's treatment of Plaintiff, he does not specify how.  A review of the

record demonstrates both Dr. Scharf and Dr. Heekin determined Plaintiff was

experiencing pain.  In fact, nothing in their opinions seem to be at odds with Dr. Trescot's

documentation of Plaintiff's pain.  Neither Dr. Scharf nor Dr. Heekin commented on the

intensity of Plaintiff's pain; nor did they opine on his limitations, except to the extent that

they both recognized Plaintiff had limitations, in that he was having trouble completing

his daily activities and he was unable to work at his past job.

The ALJ's decision leaves the Court questioning how Drs. Scharf and Heekin's

opinions contradict Drs. Pennick and Trescott's opinions.  While it is true that in March

2004, Dr. Scharf noted Plaintiff's loss of movement was slight, the records demonstrate

Plaintiff's limitations fluctuated.  Notably, the records also demonstrate that over the

course of three years, Plaintiff was consistently in pain and he regularly sought treatment

---

[3] The ALJ also noted that the opinions of Drs. Scharf and Heekin are given greater
deference because they are specialists.  (Tr. 18).

for such pain and other limitations.  Moreover, the fact that Drs. Scharf and Heekin did

not consider surgery a viable option for Plaintiff does nothing to contradict Drs. Pennick

and Trescot's assessment of Plaintiff's limitations.  It is incumbent upon the ALJ to

specifically articulate how the record either does not support or conflicts with both Dr.

Pennick's and Dr. Trescot's assessment.

As the Court has already determined this case is due to be remanded, the Court

now directs the ALJ to reconsider both Dr. Pennick and Dr. Trescot's records, as well as

Dr. Scharf and Dr. Heekin's records, and reconsider whether Dr. Pennick's and Dr.

Trescot's assessment of Plaintiff's limitations should be afforded controlling weight .  In

the event the ALJ again determines they are not entitled to such weight, the ALJ should

clearly articulate how the evidence conflicts or fails to bolster his opinion, or how either

opinion is inconsistent with that particular doctor's own medical records.

### 3.   Whether the ALJ Erred in Finding Plaintiff Capable of Performing the Exertional Demands of Light Work

Plaintiff argues the ALJ erred by finding Plaintiff capable of performing light work,

which entails standing and walking for six hours in an 8-hour workday and lifting and

carrying up to 20 pounds.  (Doc. 14, pp. 19-20).  Plaintiff contends he relies on a cane to

walk and thus, he cannot perform light work.  Id. at 20.  Plaintiff argues that while the use

of a cane does not always impact the ability to perform sedentary work, it does impact

the ability to perform light work.  Id. at 21.  The Commissioner on the other hand, argues

that there is evidence in the record that Plaintiff can walk without a cane.  (Doc. 17, p. 9).

There is evidence that shows Plaintiff relies on and needs a cane for ambulating,

but there is also evidence showing Plaintiff is able to walk slow, but steady, without a

22

cane.  On remand, the ALJ should fully reconsider the medical evidence to determine whether Plaintiff requires a cane and to what extent Plaintiff's walking and standing is limited.  He shall then reassess Plaintiff's RFC and shall articulate what evidence he relies upon as credible and what evidence he rejects.  Moreover, in reassessing Plaintiff's RFC, the ALJ should take caution to explain in detail the specific evidence relating to Plaintiff's usage of a cane which supports his assessment.

### 4.    Whether the ALJ Erred in Finding Plaintiff Capable of Performing Alternative Work in the National Economy

Lastly, Plaintiff argues that when the ALJ posed hypothetical questions to the VE, he failed to include all of Plaintiff's impairments.  (Doc. 14, pp. 23-25).  Specifically, Plaintiff argues the ALJ failed to take Plaintiff's use of a cane, the limitations found by both Drs. Pennick and Trescot, and Plaintiff's subjective complaints into consideration. Id. at 24.  Therefore, Plaintiff contends, the ALJ's reliance on the VE's testimony that there were other jobs Plaintiff could perform was error.  Id. at 24.  This issue will be resolved on remand in light of the ALJ's reconsideration of the evidence of record, including Plaintiff's subjective complaints of pain, the treating physician's opinions, and Plaintiff's limitations in walking and standing.  On remand, in compliance with Eleventh Circuit precedent, the ALJ is instructed to pose hypothetical questions which comprehensively describe Plaintiff's limitations.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned finds the ALJ's decision is not supported by substantial evidence and is not based upon the proper legal standards.

Accordingly, it is hereby

**ORDERED**:

The Commissioner's decision is hereby **REVERSED** and **REMANDED** pursuant to sentence four, 42 U.S.C. 405(g).  Upon remand, the ALJ shall (1) reconsider Plaintiff's testimony in light of all of the evidence, and explicitly articulate his reasons for accepting or rejecting Plaintiff's testimony; (2) reconsider Drs. Pennick and Trescott's opinions, and in the event the ALJ finds they are not entitled to substantial weight, he should clearly articulate specific reasons as to how the evidence conflicts or fails to bolster such opinion, or how the opinions are inconsistent with each physician's own medical records; (3) reconsider whether Plaintiff needs to rely on the use of a cane to ambulate and generally consider Plaintiff's limitations with respect to standing and walking; and (4) make sure to include all of Plaintiff's limitations in the hypothetical questions he poses to the VE.  Finally, the ALJ may conduct any further proceedings he finds necessary in light of any new findings.

The Clerk of Court is directed to enter judgment consistent with this Order and Opinion, and thereafter to close the file.  The judgment shall state that if Plaintiff were to ultimately prevail in this case upon remand to the Social Security Administration, any motion for attorney fees under 42 U.S.C. § 406(b) must be filed within fourteen (14) days of the Commissioner's final decision to award benefits.  See Bergen v. Commissioner of Social Security, 454 F.3d 1273, 1278, n.2 (11th Cir. 2006); Fed. R. Civ. P. 54(d)(2)(B); M.D. Fla. Loc. R. 4.18(a).

**DONE AND ENTERED** at Jacksonville, Florida, this __27th__ day of March, 2008.

_Monte C. Richardson_

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record